# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | |
|---|---|
| § | |
| LOCAL 210 UNITY PENSION AND WELFARE FUNDS, Individually and On Behalf of All Others Similarly Situated, § | **CIVIL ACTION NO. 4:13-cv-02393** |
| § | |
| § | CLASS ACTION |
| Plaintiff, § | |
| § | |
| vs. § | **COMPLAINT FOR VIOLATION OF** |
| § | **THE FEDERAL SECURITIES LAWS** |
| MCDERMOTT INTERNATIONAL, INC., § | |
| STEPHEN M. JOHNSON, and PERRY L. § | |
| ELDERS § | |
| § | JURY TRIAL DEMANDED |
| Defendants. § | |
| § | |

By and through its undersigned counsel, Plaintiff Local 210 Unity Pension and Welfare Funds ("Local 210") alleges the following against McDermott International, Inc. ("McDermott" or the "Company") and certain of the Company's executive officers and directors (the "Individual Defendants"). Plaintiff makes these allegations upon personal knowledge as to those allegations concerning Plaintiff and, as to all other matters, upon the investigation of counsel, which included, without limitation:  (a) review and analysis of public filings made by McDermott and other related parties and non-parties with the Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and other publications disseminated by certain of the Defendants and other related non-parties; (c) review of news articles, shareholder communications, conference call transcripts, and postings on McDermott's website concerning the Company's public statements; and (d) review of other publicly available information concerning McDermott and the Individual Defendants.

## I.   NATURE OF THE ACTION

1.     This is a federal securities class action against McDermott and certain of its officers for violations of the federal securities laws.  Plaintiff brings this action on behalf of all persons or entities who purchased or otherwise acquired shares of McDermott common stock between November 6, 2012 and August 5, 2013, inclusive (the "Class Period"), seeking to pursue remedies under §§10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act").  The Exchange Act claims allege that Defendants engaged in a fraudulent scheme to artificially inflate the Company's stock price.  As a result of the fraud described below, the Company has lost a substantial portion of its value.

2.     Defendant McDermott maintains principal executive offices in Houston, Texas. McDermott is an engineering, procurement, construction and installation ("EPCI") company focused on executing complex offshore oil and gas projects worldwide.  The Company provides integrated EPCI services for upstream field developments including, fixed and floating production facilities, pipelines and subsea systems from concepts to commissioning.  McDermott operates in approximately 20 countries across the Atlantic, Middle East and Asia Pacific area.

3.     Plaintiff alleges that Defendants have fraudulently inflated McDermott's stock price during the Class Period by disseminating materially false and misleading statements, and failing to disclose material information known or recklessly disregarded by Defendants, concerning the Company's true financial condition, operation and business prospects.

4.     Specifically, throughout the Class Period, Defendants made false and misleading statements and/or failed to disclose that: (a) the Company was experiencing weaknesses in its project bidding and execution; (b) the Company was engaging in poor risk evaluation; (c) the Company had been experiencing poor project management; (d) the Company was experiencing

material losses in its Middle East, Asia Pacific and Atlantic segments; and (e) based upon the above, the Defendants lacked a reasonable basis for their positive statements about the Company during the Class Period.

5.     As a result of Defendants' wrongful acts, false and misleading statements and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## II.     JURISDICTION AND VENUE

6.     This action arises under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b 5).

7.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

8.     Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act and 28 U.S.C. §1391(b).  Many of the acts and conduct complained of herein, including the preparation and dissemination of materially false and misleading information to the investing public, occurred in substantial part in this District.

9.     In connection with the acts and omissions alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## III.     PARTIES

### A.     Plaintiff

10.     Plaintiff Local 210 Unity Pension and Welfare Funds, as set forth in the accompanying certification and incorporated by reference herein, purchased the publicly traded

McDermott securities at artificially inflated prices during the Class Period and has been damaged thereby.

**B.**     **Defendants**

**i.**     **The Company**

11.     Defendant McDermott is an EPCI company incorporated under the laws of the Republic of Panama with headquarters in Houston, Texas.  During the Class Period, McDermott maintained executive offices in Houston at 757 North Eldridge Parkway, Houston, Texas 77079. The aggregate number of McDermott securities outstanding as of August 5, 2013 was approximately 236.2 million shares.  McDermott common stock is listed on the New York Stock Exchange ("NYSE") stock market under the ticker "MDR."

**ii.**     **The Individual Defendants**

12.     Defendant Stephen M. Johnson ("Johnson") has served as the Chief Executive Officer ("CEO"), of McDermott since July 2010.  Previously, Johnson served as President and Chief Executive Officer of J. Ray McDermott, S.A., one of McDermott's subsidiaries, and McDermott's President and Chief Operating Officer from April 2009 to December 2009. Johnson signed the Company's SEC filing on Form 10-K, certified the Company's SEC filings and participated in conference calls with analysts and investors during the Class Period.

13.     Defendant Perry L. Elders ("Elders") has served as the Senior Vice President and Chief Financial Officer ("CFO") of McDermott since July 2010.  Previously, Elders served as Senior Vice President and CFO of J. Ray McDermott, the Company's subsidiary, from April 2010 to July 2010.  Elders signed and certified the Company's SEC filings and participated in conference calls with analysts and investors during the Class Period.

14.     Defendants Johnson and Elders are collectively referred to as the "Individual Defendants."

15.     The Company and the Individual Defendants are collectively referred to herein as the "Defendants."

16.     During the Class Period, the Individual Defendants, as senior executive officers of McDermott, were privy to confidential, proprietary and material adverse non-public information concerning McDermott, its operations, finances, financial condition and present and future business prospects via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or board of directors meetings and committees thereof, and via reports and other information provided to them in connection therewith.   Because of their possession of such information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

17.     The Individual Defendants are liable as direct participants in the wrongs complained of herein.   In addition, the Individual Defendants, by reason of their status as senior executive officers and/or directors, were "controlling persons" within the meaning of §20(a) of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein.   Because of their positions of control, the Individual Defendants were able to and did, directly or indirectly, control the conduct of McDermott's business.

18.     The Individual Defendants, because of their positions with the Company, controlled and/or possessed the authority to control the contents of its reports, press releases and presentations to securities analysts and, through such analysts, to the investing public.   The

Individual Defendants were provided with copies of the Company's reports and publicly disseminated documents alleged herein to be misleading, prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Thus, the Individual Defendants had the opportunity to commit the fraudulent acts alleged herein.

19.     As senior executive officers and/or directors and as controlling persons of a publicly traded company whose securities were, and are, registered with the SEC pursuant to the Exchange Act, and are traded on the NYSE and governed by the federal securities laws, the Individual Defendants had a duty to disseminate promptly accurate and truthful information with respect to McDermott's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings, and present and future business prospects, to correct any previously issued statements that had become materially misleading or untrue, so the market price of McDermott's securities would be based on truthful and accurate information.   The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

20.     The Individual Defendants are liable as participants in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of McDermott's publicly traded securities by disseminating materially false and misleading statements and/or concealing material adverse facts.

IV.    **SUBSTANTIVE ALLEGATIONS**

A.    **Background of McDermott**

21.     McDermott is an EPCI company focused on designing and executing complex offshore oil and gas projects worldwide.   The Company provides integrated EPCI services,

delivering fixed and floating production facilities, pipeline installations and subsea systems.  The Company purports to support its activities with project management and procurement services, while utilizing its integrated capabilities in both shallow and deep water construction. McDermott's customers include national, major integrated and other oil and gas companies and the Company operates in offshore oil and gas producing regions throughout the world.

> **B.**     **False and Misleading Statements**

22.     In regular press releases, conference calls and filings with the SEC, McDermott and the Individual Defendants repeatedly made false and misleading statements and/or failed to disclose material adverse facts concerning the state and expectation of McDermott's growth, operations, business prospects and finances, all of which raise significant concerns about the Company's future stability and have caused the stock price to steadily decline.

23.     On November 5, 2012, the Company issued a press release reporting its financial and operating results for the third quarter ending September 30, 2012.  The Company stated in pertinent part as follows:

> HOUSTON--(BUSINESS WIRE)--Nov. 5, 2012-- McDermott International, Inc. (NYSE: MDR) ("McDermott" or the "Company") today reported income of $50.6 million, or $0.21 per diluted share, for the 2012 third quarter. The results of the 2012 third quarter compare to income from continuing operations of $9.8 million, or $0.04 per diluted share, in the corresponding period of 2011. Weighted average common shares outstanding on a fully diluted basis were approximately 237.9 million and 236.9 million in the quarters ended September 30, 2012 and September 30, 2011, respectively.
>
> McDermott's revenues were $1,028.7 million for the 2012 third quarter compared to $879.9 million in the corresponding period of 2011. The ***year-over-year increase was attributable to the Middle East and Atlantic segments***, primarily due to increased fabrication and marine activity. The increase from these segments was partially offset by lower revenues in the Asia Pacific segment due to lower marine activity.
>
> The Company's operating income in the 2012 third quarter was $82.5 million compared to $35.2 million in the 2011 third quarter. The increase in operating

income was primarily due to approximately $50 million in project losses recognized in the 2011 third quarter, in addition to higher fabrication and marine activity in the Middle East and Atlantic segments and additional change order activity in the Asia Pacific segment in the 2012 third quarter.

*"The positive results of our 2012 third quarter keep us on track for a solid 2012 financial performance,"* said Stephen M. Johnson, Chairman of the Board, President and Chief Executive Officer of McDermott. "We see continued strength in our end markets and are encouraged by the significant level of bids and targeted market opportunities."

The Company's other income for the third quarter of 2012 was $1.7 million, which represents an improvement of $1.3 million as compared to other income of $0.4 million in the third quarter of 2011 primarily attributable to increased interest income.

*At September 30, 2012, the Company's backlog was approximately $5.3 billion*, compared to $5.7 billion and $4.3 billion at June 30, 2012 and September 30, 2011, respectively.

**Balance Sheet Summary**
As of September 30, 2012, McDermott reported total assets of approximately $3.4 billion. Included in this amount was $720.7 million of cash and cash equivalents, restricted cash and investments. Net working capital, calculated as current assets less current liabilities, was $679.4 million. Additionally, total equity was over $1.9 billion, or approximately 57% of total assets, with total debt of $108.3 million.

24.     On the same day, the Company filed its quarterly report for the period ended September 30, 2012 on Form 10-Q with the SEC, that was signed by Defendant Elders, and repeated the Company's previously announced quarterly financial results.  In addition, the Form 10-Q contained signed certifications pursuant to SOX by Defendants Johnson and Elders, stating that the financial information contained in the Form 10-Q was accurate, fairly presented, in all material respects, the financial condition and results of operations of the Company, and disclosed all material changes in the Company's internal control over financial reporting.

25.     On February 28, 2013, the Company issued a press release reporting its financial and operating results for fourth quarter and fiscal year ended December 31, 2012.  The Company stated in pertinent part as follows:

HOUSTON--(BUSINESS WIRE)--Feb. 28, 2013-- McDermott International, Inc. (NYSE: MDR) ("McDermott" or the "Company") today reported net income of $40.5 million, or $0.17 per diluted share, for the 2012 fourth quarter. The results of the 2012 fourth quarter compare to income from continuing operations of $9.3 million, or $0.04 per diluted share, in the corresponding period of 2011. Weighted average common shares outstanding on a fully diluted basis were approximately 237.8 million and 236.9 million in the quarters ended December 31, 2012 and 2011, respectively.

McDermott's revenues were $996.0 million for the 2012 fourth quarter, an increase of 22 percent compared to $816.2 million in the corresponding period of 2011. *The year-over-year increase was primarily due to a 36 percent increase in revenues in the Asia Pacific segment as a result of increased marine activity on a subsea project, coupled with increased revenues in the Middle East and Atlantic segments.*

The Company's operating income in the 2012 fourth quarter was $77.3 million, an increase of 146 percent compared to $31.4 million in the 2011 fourth quarter. Results in the fourth quarter 2011 included approximately $66 million in pretax and after-tax charges primarily related to loss projects in Mexico and Brazil. The fourth quarter 2012 results were negatively affected by an aggregate of approximately $32 million of project losses and increased costs on certain projects, including approximately $23 million in the Asia Pacific segment as a result of incremental costs associated with anticipated productivity and project delays on one subsea project, which is expected to complete in late 2013. The Atlantic segment also was impacted by increased cost estimates relating to two fabrication projects totaling approximately $9 million, due to lower than expected productivity, which are expected to complete in mid-2013.

The Company's other income for the fourth quarter of 2012 was $8.7 million, an improvement of $4.8 million compared to other income of $3.9 million in the fourth quarter of 2011, primarily due to higher foreign currency gains.

*At December 31, 2012, the Company's backlog was $5.1 billion,* compared to $3.9 billion and $5.3 billion at December 31, 2011 and September 30, 2012, respectively. Of the December 31, 2012 backlog, approximately $545 million is from six projects currently in a loss position, primarily relating to the recently commenced project in the Asia Pacific segment and a five-year charter in Brazil, where future revenues are expected to equal costs when recognized. In addition,

the backlog includes approximately $162 million for one project under deferred profit recognition.

"There were a number of positives during the quarter as fourth quarter bookings, combined with awards received in the first quarter 2013, maintained a strong backlog and improved revenue visibility for the coming year," said Stephen M. Johnson, Chairman of the Board, President and Chief Executive Officer of McDermott. ***We expect to recognize $2.6 billion in revenue in 2013 from our existing backlog and recent awards.*** With this revenue, combined with additional short-term work that we typically accrue throughout the year, we expect to see total revenues in the range of $3 billion in 2013. With increased bidding activity and the company's continued balance sheet strength, we believe McDermott is well positioned to meet the growing customer demand in each of our market segments."

**Balance Sheet Summary**
As of December 31, 2012, McDermott reported total assets of approximately $3.3 billion. Included in this amount was $704.3 million of cash and cash equivalents, restricted cash and investments. Net working capital, calculated as current assets less current liabilities, was $676.8 million. Additionally, total equity was $2.0 billion, or approximately 61% of total assets, with total debt of $102.7 million.

**Full-year 2012 Overview**
For the year ended December 31, 2012, McDermott reported revenues of $3.6 billion, with operating income of $319.3 million and net income of $206.7 million, or $0.87 per fully diluted share. Operating income for 2012 in the Asia Pacific segment benefited significantly from lower expected costs to complete the marine campaign on an engineering, procurement, construction and installation project, which is expected to complete in early 2013. These gains were partially offset by project losses across each segment totaling approximately $52.0 million.

26.     On the same day, the Company filed its annual report for the year ended December 31, 2012 on Form 10-K with the SEC, that was signed by, among others, Defendants Johnson and Elders, and repeated the Company's previously financial results.  In addition, the Form 10-K contained signed certifications pursuant to SOX by Defendants Johnson and Elders, stating that the financial information contained in the Form 10-K was accurate, fairly presented, in all material respects, the financial condition and results of operations of the Company, and disclosed all material changes in the Company's internal control over financial reporting.

27.     On May 8, 2013 the Company issued a press release reporting its financial and operating results for the first quarter ending March 31, 2013.  The Company stated in pertinent part as follows:

> HOUSTON--(BUSINESS WIRE)--May. 8, 2013-- McDermott International, Inc. (NYSE: MDR) ("McDermott" or the "Company") today reported net income of $20.6 million, or $0.09 per fully diluted share, for the quarter ended March 31, 2013. The results for the first quarter 2013 compared to income from continuing operations of $61.9 million, or $0.25 per fully diluted share, in the corresponding period of 2012. Weighted average common shares outstanding on a fully diluted basis were approximately 239.2 million and 237.3 million in the quarters ended March 31, 2013 and 2012, respectively.
>
> McDermott's revenues were $807.5 million for the first quarter 2013, an increase of 11 percent compared to $727.7 million in the corresponding period of 2012. *The year-over-year increase was primarily due to an approximately $48.6 million increase in revenues in the Atlantic segment as a result of increased fabrication activity, coupled with increased revenues in the Asia Pacific and Middle East segments.*
>
> The Company's operating income in the first quarter 2013 was $53.0 million, a decrease of $27.2 million compared to $80.2 million in the first quarter 2012. The first quarter 2013 results were affected by operating losses in the Middle East and Atlantic segments, partially offset by stronger operating income in our Asia Pacific segment. In the first quarter 2013, operating losses in the Middle East segment totaled approximately $18.5 million compared to operating income of $34.7 million for the corresponding prior year period, a decline primarily attributable to execution plan changes on a project at an advanced stage of completion, which resulted in cost increases associated with hook-up activities and the use of third-party vessels. In addition, the decline in operating income was due to lower asset utilization and project activity compared to the prior year. The operating loss for the Atlantic segment changed by approximately $4.4 million to a loss of approximately $16.4 million due to increased support costs associated with lower marine asset utilization.
>
> Operating income in the Asia Pacific segment increased approximately $30.5 million to $88.0 million in the first quarter 2013, primarily due to the successful execution and change orders on a key project as well as cost savings on other projects offset by approximately $4.1 million in increased costs estimates for one of our marine subsea projects. In addition, an approximately $12.3 million or $0.05 per diluted share gain on the sale of the *DB 26* was recognized during the quarter for the segment.

The Company's other expense for the first quarter 2013 was $1.4 million, a reduction of $11.9 million compared to other income of $10.5 million in the first quarter 2012, primarily due to net losses on foreign currency related items.

During the quarter, the Company booked approximately $1.0 billion in new orders including two projects in the Arabian Gulf. In addition, at March 31, 2013 the Company had approximately $5.6 billion in bids and change orders outstanding. The Company has also identified $10.1 billion in target project opportunities that the Company expects to bid in the next five quarters.

***At March 31, 2013, the Company's backlog was $5.3 billion***, compared to $5.8 billion and $5.1 billion at March 31, 2012 and December 31, 2012, respectively. Of the March 31, 2013 backlog, approximately $428.9 million was derived from five projects currently in a loss position, of which 93 percent relate to a project in the Asia Pacific segment and the five-year charter in Brazil. In addition, the backlog includes approximately $165.6 million for one project under deferred profit recognition.

"Although the final phases of an otherwise well-executed project in the Middle East challenged us this quarter, I am pleased with our successful completion of a key project in the Asia Pacific segment," said Stephen M. Johnson, Chairman of the Board, President and Chief Executive Officer of McDermott. "With the sale of the *DB 26* and our expansion of our subsea engineering talent through the acquisition of DeepSea group, ***McDermott is making steady progress on its strategic transformation.*** We remain focused on winning work for which we can provide a cost-effective solution and execute successfully for our customers and for our shareholders."

**Balance Sheet Summary**
As of March 31, 2013, McDermott reported total assets of approximately $3.2 billion. Included in this amount was $502.4 million of cash and cash equivalents, restricted cash and investments. Net working capital, calculated as current assets less current liabilities, was $616.2 million. Additionally, total equity was $2.0 billion, or approximately 62% of total assets, with total debt of $101.2 million.

28.     On the same day, the Company filed its quarterly report for the period ended

March 31, 2013 on Form 10-Q with the SEC, that was signed by Defendant Elders, and repeated

the Company's previously announced quarterly financial results.  In addition, the Form 10-Q

contained signed certifications pursuant to SOX by Defendants Johnson and Elders, stating that

the financial information contained in the Form 10-Q was accurate, fairly presented, in all

material respects, the financial condition and results of operations of the Company, and disclosed all material changes in the Company's internal control over financial reporting.

29.    The Company's aforementioned statements are false and misleading because Defendants misrepresented and failed to disclose adverse facts, which were known to Defendants or recklessly disregarded by them, including that (i) the Company was experiencing weaknesses in its project bidding and execution; (ii) the Company was engaging in poor risk evaluation; (iii) the Company had been experiencing poor project management; (iv) the Company was experiencing losses in its Middle East, Asia Pacific and Atlantic segments; and (v) as a result of the above, the Company's financial statements, assurances and expectations with regard to the Company's growth, operations, and business prospects were false and misleading at all relevant times.

### C.    <u>The Truth Comes To Light</u>

30.    On August 5, 2013 the Company issued a press release, reporting the Company's second quarter financial and operating results for the quarter ending June 30, 2013, stating a substantial decrease in the Company's year-over-year financial results which the Company attributed to poor performance of several significant projects in the Middle East and Asia Pacific segment along with underutilization of assets in the Company's Atlantic segment.  The Company additionally disclosed that it was taking immediate action to correct "weaknesses" in its "project bidding and execution" and management was putting in place four initiatives in order to create a "more disciplined culture within the Company" to deliver adequate return on the Company's investors' capital.  The Company's press release stated in pertinent part as follows:

> HOUSTON--(BUSINESS WIRE)--Aug. 5, 2013-- McDermott International, Inc. (NYSE: MDR) ("McDermott" or the "Company") today reported a net loss of $149.4 million, or $0.63 per fully diluted share, for the quarter ended June 30, 2013. These results compared to income of $52.7 million, or $0.22 per fully

diluted share, in the corresponding period of 2012. Weighted average common shares outstanding on a fully diluted basis were approximately 236.2 million and 237.5 million in the quarters ended June 30, 2013 and 2012, respectively.

McDermott's revenues were $647.3 million for the 2013 second quarter compared to $889.2 million in the corresponding period of 2012. The year-over-year decrease was attributable to the Middle East and Asia Pacific segments, primarily due to the completion of several significant projects that were active in the 2012 second quarter. The decrease from these segments was partially offset by higher revenues in the Atlantic segment due to higher fabrication activity in Mexico. The Company's operating loss in the 2013 second quarter was $149.5 million compared to operating income of $79.4 million in the 2012 second quarter.

**Project Challenges**

Additional project-related charges on two projects discussed last quarter resulted in operating losses in the Asia Pacific and Middle East segments. In the Asia Pacific segment, the Company increased its loss estimates by $62.0 million due to delays on a deepwater pipelay project in Malaysia. Late deliveries from suppliers and a prolonged reconfiguration of one of the Company's marine vessels pushed the project's installation plan into the monsoon season. As a result, the Company now plans to execute the offshore work in two separate campaigns in 2013 and 2014, to utilize additional third-party support vessels, and has accrued liquidated damages. The Company expects to complete the project in the second quarter 2014.

In addition, the Middle East segment's results were impacted by a $38.0 million charge to one project in Saudi Arabia. The charge reflects an estimated increase in the Company's vessel mobilization costs to complete an extended offshore hookup campaign. Inclusive of the second quarter charges, the project remains in an overall profitable position and is expected to be completed by mid-2014. Two of the other loss projects reported last quarter have now been completed.

**Management Actions**

*"As a management team, we are taking immediate and decisive actions to correct the weakness we have experienced in our project bidding and execution,"* said Stephen M. Johnson, Chairman of the Board, President and Chief Executive Officer of McDermott. "We are driving a more disciplined culture within the Company, and we expect our operating leadership change announced separately today will add focus and urgency to our intentions. Although these problematic projects are expected to require some time to fully work through the system, the initiatives listed below reinforce our commitment to delivering an adequate return on our investors' capital."

**Atlantic Restructuring**

With the goal of substantially consolidating the Atlantic segment, the Company commenced the restructuring of its Atlantic operations in the second quarter 2013.

The restructuring includes personnel reductions in Houston and New Orleans as well as a relocation of Morgan City's fabrication and marine activities to Altamira, Mexico, following the completion of Morgan City's existing projects in backlog. Restructuring costs are expected to range between $45 million to $60 million and include severance, asset impairment and relocation expenses, and future Morgan City lease costs. Approximately $15.5 million of these restructuring costs were incurred during the 2013 second quarter, and the majority is expected to be recognized over the next four quarters.

**Project Bidding and Execution**
The Company is employing a multi-faceted approach to improve overall bidding and execution. First, the Company has accelerated its ongoing initiative to overhaul the leadership of its project delivery teams by hiring experienced project leaders and project-focused control and risk management personnel from outside McDermott. Second, the Company has initiated project-level incentive plans that more directly align individual compensation with project performance. Third, the Company is reevaluating risk identification and mitigation coverage to better acknowledge the Company's inherent risks when bidding.

**Establish Subsea Division**
In order to improve the Company's project bidding and execution capabilities in its newer subsea end-market, the Company has established a separate subsea division, led by a seasoned industry team recruited primarily from outside McDermott. The team is to have oversight responsibility for the Company's subsea assets and existing subsea-related projects and to assist the Company in identifying, mitigating and pricing project execution risks. While this division is still maturing, the Company believes it to be a source of future profitable growth and an area in which McDermott can solidify a meaningful market presence.

**Geographic Market Focus**
McDermott is refocusing on geographic markets in which it has the scale, expertise and relationships to secure a competitive advantage. In the 2013 second quarter, the Company launched a geographic market focus initiative intended to discontinue bidding activities where it cannot forecast sufficiently attractive return potential. Initially, the Company has decided to exit the Morgan City facility and a joint venture, and it plans to continue its review of target markets.

**Contract Backlog Summary**
At June 30, 2013, the Company's backlog was approximately $5.1 billion, compared to $5.3 billion at March 31, 2013. Of the June 30, 2013 backlog, approximately $375.1 million was derived from three projects that are currently in a loss position, of which 98 percent relate to the project in the Asia Pacific segment and a five-year charter in Brazil. In addition, the backlog includes approximately $211.9 million for one project under deferred profit recognition.

**Balance Sheet Summary**

As of June 30, 2013, McDermott reported total assets of approximately $3.2 billion. Included in this amount was $473.2 million of cash and cash equivalents, restricted cash and investments. Net working capital, calculated as current assets less current liabilities, was $349.8 million. In addition, total equity was $1.8 billion, or approximately 55% of total assets, with total debt of $95.6 million.

31. On the same day, the Company issued a separate press release titled, "McDermott Announces Executive Management Retirement" in which it announced, with no explanation, the retirement of the Company's Executive Vice President and Chief Operating Officer, John T. McCormack, in quarter four of 2013 after being with the Company ten years and serving in his current role since 2011. The press release states in pertinent part as follows:

> HOUSTON--(BUSINESS WIRE)--Aug. 5, 2013-- McDermott International, Inc. (NYSE: MDR) ("McDermott" or the "Company") announced today that John T. McCormack, Executive Vice President and Chief Operating Officer, has advised the Company of his intention to retire, effective in the fourth quarter of this year. Mr. McCormack (age 66) has been with McDermott for ten years and has held his current role since 2011.

> "I would like to thank Jack for his decade of contribution to McDermott," said Stephen M. Johnson, Chairman, President and Chief Executive Officer of McDermott, "His commitment and knowledge of the business have earned him the respect of employees and customers around the world, and we extend our best wishes to Jack for his retirement."

> An internal and external search effort is underway for a successor, whom the Company expects to name in the near-term to provide for a smooth transition.

32. The next day, August 6, 2013, the Company held an investor conference call discussing the Company's second quarter 2013 poor performing financial results and significant deficiencies in the Company's project bidding and execution along with the Company's poor risk evaluation as discussed in the Company's press release the previous day. In addition, Defendant Johnson had the following exchange with an analyst regarding shareholders' belief that the initiatives taken by management as a response to the Company's poor performance should have taken place "a while ago":

**Andrew Kaplowitz of Barclays**

**Q - Andrew A. Kaplowitz**: Steve, with all due respect, *I think most shareholders believe that many of the actions management's taking today should have been done a while ago.* So what can you say to investors to convince them that things still don't get worse from here, and how long would we have to wait for the results of these initiatives that you're putting in place today? Like, when do you think we'll have all these guys sort of operating and doing better for the company?

**A - Stephen M. Johnson**: That's a fair question, Andy. I would say this. Many of the actions, but not all, do fall into the category of basic blocking and tackling, if I can use that analog. As I indicated in my prepared remarks, *we have the procedural discipline in place, but we have had challenges recently in having our project teams adhere to those procedures and disciplines. That's a management problem and a management issue.*

So while they do seem, in some cases, rather basic, that's the point. They need to be basic so that they're clear, but management needs to respond now and very quickly to compel performance against those procedures. That'd be my initial response.

How quickly will these new people, their new training, and management fiat take over? I would say it would be very quickly on backlog projects. We've put these procedures and these management initiatives in place and in effect now.

*Now, we can't do anything about the bid misses. We have to deal with those straight up with our customers and with our shareholders as we liquidate the backlog.* But on new projects, the rigor around estimating, bidding, making sure that we've got the proper risk coverage, that we've got the proper margin in the bid, is a day-by-day plan.

Lastly, the Subsea organization – it's hard to probably tell from what I said in my comments, but I have moved those people with specific technical expertise and managerial experience to oversee backlog projects that have a subsea component to them. In many cases, they have direct-line-of-sight responsibility – call it P&L over those projects. In other cases, they are looking over the shoulder of the other P&L entities.

So they're in place and in effect. There's not enough of them yet, but by the end of the year, we feel we'll have the top line of that organization in place so that they can oversee these subsea programs.

I'll pause there and see if there's a follow-up, Andy.

**Q - Andrew A. Kaplowitz**: Yeah. So, Steve, I mean, I think we understand the subsea issues. I mean it's first of a kind. I think we understand that. But the thing that I'm having a hard time with, though, is that why is the rest of the business really falling apart now?

Your COO was around for the last 10 years, and you've had several years of decent performance over the last decade. Yes, you've had your issues, but this seems like gaping holes in a lot of your businesses. And so it's just strange that all of a sudden this is happening. Is it more competition ratcheted up on you and the company was slow to respond, or something else?

**A - Stephen M. Johnson**: I think it's two things. To be fair, there is an element of that that suggests that competition has ratcheted up in certain of our markets, Andy, including the Middle East and including Asia Pacific. And while it is not our intention to follow down an undisciplined bidder, if you will, or an irrational bidder, sometimes you find yourself in a situation where you make assumptions in the bid that you should not make, and that's our management failing.

The bigger issue, in my view, *is that we were not fully focused on managing the backlog with a full line of sight from the management, from operations management of the company, through the regional leaders and into the projects.* And many of the things that I talked about in my prepared comments create that line-of-sight visibility and compel performance through our procedures, and places oversight on top of these programs. That was not present in the company, and I've changed that.

**Q - Andrew A. Kaplowitz**: Has the business become so lumpy and volatile that you really need to find a partner? And if you did need to find a partner, what can you do to make the business more attractive for that partner?

**A - Stephen M. Johnson**: I think settling down the performance, Andy, is the obvious answer. We have got to have more predictability in the business, and it starts with project execution. And that starts with making sure we understand the scope of the facilities and the scope of services we have to provide and adequately pricing it, and pricing the risk, and getting paid for the risk. So I think that's the answer. We've got to settle it down.

33.     On this news, the Company's shares declined $1.80 per share on August 6, 2013 to close at $6.93 per share, a one-day decline of 19% on heavy trading volume.

34.     As reported by *Forbes Magazine*, in an article titled "McDermott International (MDR) Shares Cross Below Book Value," the Company's August 6, 2013 share price

represented a cross below the shares' last reported book value- defined as common shareholder equity per share- of $8.06.

35.     As a result of Defendants' wrongful course of conduct, McDermott shareholders have lost millions of dollars in their investment in the Company.

## V.     **UNDISCLOSED ADVERSE INFORMATION**

36.     The market for McDermott's securities was an open, well-developed and efficient market at all relevant times.  As a result of the materially false and misleading statements and failures to disclose described herein, McDermott's securities traded at artificially inflated prices during the Class Period.  Plaintiff and the other members of the Class purchased or otherwise acquired McDermott's securities relying upon the integrity of the market price of McDermott's securities and market information related to McDermott, and have been damaged thereby.

37.     During the Class Period, Defendants materially misled the investing public, thereby inflating the price of McDermott's securities, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and misleading.  Such statements and omissions were materially false and misleading in that they failed to disclose material adverse non-public information and misrepresented the truth about the Company, its business and operations, as alleged herein.

38.     At all relevant times, the material misrepresentations and omissions particularized herein directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and the other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and misleading statements about McDermott's business, prospects and operations.

39.    These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of McDermott and its business, prospects and operations, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times.  Defendants' false and misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein.

## VI.    NO SAFE HARBOR

40.    The federal statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded herein. Furthermore, many of the statements pleaded herein were not identified as "forward-looking statements" when made, or indicated that actual results "could differ materially from those projected."  Nor were there any meaningful cautionary statements identifying important factors that could cause actual results to differ materially from the statements made therein.

41.    Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of McDermott who knew that those statements were false when made.

## VII.    SCIENTER ALLEGATIONS

42.    As alleged herein, the Individual Defendants acted with scienter in that the Individual Defendants knew that the public documents and statements issued or disseminated in the name of the Company during the Class Period were materially false and misleading; knew

that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

43.     As set forth herein, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding McDermott, their control over, receipt and/or modification of McDermott's allegedly materially misleading statements and omissions, and/or their positions with the Company which made them privy to confidential information concerning McDermott, participated in the fraudulent scheme alleged herein.

44.     The ongoing fraudulent scheme described herein could not have been perpetrated over a substantial period of time, as has occurred, without the knowledge and complicity of the personnel at the highest level of the Company, including the Individual Defendants.

## VIII.   LOSS CAUSATION

45.     During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the prices of McDermott's securities and operated as a fraud or deceit on Class Period purchasers of McDermott's securities by failing to disclose to investors that the Company's financial results were materially misleading and misrepresented material information.  When Defendants' misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the prices of McDermott's securities fell precipitously as the prior inflation came out of the Company's stock price.  As a result of their purchases of McDermott's securities during the Class Period, Plaintiff and the other Class members suffered economic loss, *i.e.* damages, under the federal securities law.

46.     By failing to disclose the true state of the Company's business prospects and operations, investors were not aware of the true state of the Company's financial status.

Therefore, Defendants presented a misleading picture of McDermott's business and prospects. Thus, instead of truthfully disclosing during the Class Period the true state of the Company's business, Defendants caused McDermott to conceal the truth.

47.    Defendants' false and misleading statements caused McDermott's common stock to trade at artificially inflated levels throughout the Class Period.  However, as a direct result of the Company's problems coming to light, McDermott's common stock price fell precipitously from its Class Period high.  The stock price drop discussed herein caused real economic loss to investors who purchased the Company's securities during the Class Period.

48.    The decline in the price of McDermott's common stock after the truth came to light was a direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market.  The timing and magnitude of McDermott's common stock price decline negates any inference that the loss suffered by Plaintiff and the other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to the Defendants' fraudulent conduct.  The economic loss suffered by Plaintiff and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the prices of McDermott's securities and the subsequent decline in the value of McDermott's securities when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

## IX.    APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE

49.    At all relevant times, the market for McDermott stock was an efficient market for the following reasons, among others:

a.    McDermott securities met the requirements for listing, and were listed and actively traded on the NYSE, a highly efficient market;

b.      As a regulated issuer, McDermott filed periodic public reports with the SEC and the NYSE;

c.      McDermott securities were followed by securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace; and

d.      McDermott regularly issued press releases which were carried by national newswires.  Each of these releases was publicly available and entered the public marketplace.

50.      As a result, the market for McDermott securities promptly digested current information with respect to the Company from all publicly-available sources and reflected such information in McDermott's stock price.   Under these circumstances, all purchasers of McDermott securities during the Class Period suffered similar injury through their purchase of stock at artificially inflated prices and a presumption of reliance applies.

## X.      CLASS ACTION ALLEGATIONS

51.      Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of all persons who purchased or otherwise acquired McDermott securities during the Class Period and who were damaged thereby (the "Class").  Excluded from the Class are Defendants, members of the immediate family of each of the Individual Defendants, any subsidiary or affiliate of McDermott and the directors, officers and employees of the Company or its subsidiaries or affiliates, or any entity in which any excluded person has a controlling interest, and the legal representatives, heirs, successors and assigns of any excluded person.

52.    The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are thousands of members of the Class located throughout the United States.  Throughout the Class Period, McDermott securities were actively traded on the NYSE (an open and efficient market) under the symbol "MDR".  As of August 5, 2013, McDermott had approximately 236.2 million shares outstanding.  Record owners and other members of the Class may be identified from records maintained by McDermott and/or its transfer agents and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

53.    Plaintiff's claims are typical of the claims of the other members of the Class as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

54.    Plaintiff will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

55.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

a.    whether the federal securities laws were violated by Defendants' acts and omissions as alleged herein;

b.    whether Defendants participated in and pursued the common course of conduct complained of herein;

         c.      whether documents, press releases, and other statements disseminated to the investing public and the Company's shareholders during the Class Period misrepresented material facts about the business, finances, financial condition and prospects of McDermott;

         d.      whether statements made by Defendants to the investing public during the Class Period misrepresented and/or omitted to disclose material facts about the business, finances, value, performance and prospects of McDermott;

         e.      whether the market price of McDermott common stock during the Class Period was artificially inflated due to the material misrepresentations and failures to correct the material misrepresentations complained of herein; and

         f.      the extent to which the members of the Class have sustained damages and the proper measure of damages.

56.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this suit as a class action.

## XI.    COUNTS AGAINST DEFENDANTS UNDER THE EXCHANGE ACT

### COUNT I
**For Violations of §10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against Defendants**

57.    Plaintiff repeats and realleges the allegations set forth above as though fully set forth herein.  This claim is asserted against all Defendants.

58.     During the Class Period, McDermott and the Individual Defendants, and each of them, carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of McDermott common stock; and (iii) cause Plaintiff and other members of the Class to purchase McDermott stock at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

59.     These Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for McDermott securities in violation of §10(b) of the Exchange Act and Rule 10b-5.  Defendants are sued as primary participants in the wrongful and illegal conduct charged herein.  The Individual Defendants are also sued herein as controlling persons of McDermott, as alleged herein.

60.     In addition to the duties of full disclosure imposed on Defendants as a result of their making of affirmative statements and reports, or participation in the making of affirmative statements and reports to the investing public, they each had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC as embodied in SEC Regulation S X (17 C.F.R. § 210.01 et seq.) and S-K (17 C.F.R. § 229.10 et seq.) and other SEC regulations, including accurate and truthful information with respect to the Company's operations, financial condition and

performance so that the market prices of the Company's publicly traded securities would be based on truthful, complete and accurate information.

61.     McDermott and the Individual Defendants, individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, business practices, performance, operations and future prospects of McDermott as specified herein.  These Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of McDermott's value and performance and substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about McDermott and its business, operations and future prospects, in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of McDermott's securities during the Class Period.

62.     Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) each of the Individual Defendants was a high-level executive and/or director at the Company during the Class Period; (ii) each of the Individual Defendants, by virtue of his responsibilities and activities as a senior executive officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's operational and financial projections and/or reports; (iii) the Individual Defendants enjoyed significant personal contact and familiarity with each other and

were advised of and had access to other members of the Company's management team, internal reports, and other data and information about the Company's financial condition and performance at all relevant times; and (iv) the Individual Defendants were aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

63.     These Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were readily available to them. Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing McDermott's operating condition, business practices and future business prospects from the investing public and supporting the artificially inflated price of its stock.   As demonstrated by their overstatements and misstatements of the Company's financial condition and performance throughout the Class Period, the Individual Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were severely reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

64.     As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of McDermott securities was artificially inflated during the Class Period.   In ignorance of the fact that the market price of McDermott shares was artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known

to or recklessly disregarded by Defendants but not disclosed in public statements by these Defendants during the Class Period, Plaintiff and the other members of the Class acquired McDermott securities during the Class Period at artificially inflated high prices and were damaged thereby.

65.     At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known of the true performance, business practices, future prospects and intrinsic value of McDermott, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired McDermott securities during the Class Period, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

66.     By virtue of the foregoing, McDermott and the Individual Defendants each violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

67.     As a direct and proximate result of the Individual Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

**COUNT II**
**For Violations of §20(a) of the Exchange Act**
**Against the Individual Defendants**

68.     Plaintiff repeats and realleges the allegations set forth above as if set forth fully herein.  This claim is asserted against all the Individual Defendants.

69.     The Individual Defendants were and acted as controlling persons of McDermott within the meaning of §20(a) of the Exchange Act as alleged herein.  By virtue of their high-

level positions with the Company, participation in and/or awareness of the Company's operations and/or intimate knowledge of the Company's actual performance, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.  Each of the Individual Defendants was provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

70.     In addition, each of the Individual Defendants had direct involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

71.     As set forth above, McDermott and the Individual Defendants each violated §10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their controlling positions, the Individual Defendants are liable pursuant to §20(a) of the Exchange Act.  As a direct and proximate result of these Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## XII.   <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiff, individually and on behalf of the Class, prays for judgment as follows:

a)      Declaring this action to be a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

b) Awarding Plaintiff and the other members of the Class damages in an amount which may be proven at trial, together with interest thereon;

c) Awarding Plaintiff and the members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' and experts' witness fees and other costs; and

d) Awarding such other relief as this Court deems appropriate.

## XIII.  **JURY DEMAND**

Plaintiff demands a trial by jury.

Dated: August 15, 2013

> **ABRAHAM, WATKINS, NICHOLS, SORRELS, AGOSTO & FRIEND**
>
> By: _____ */s/ Sammy Ford IV*
> Sammy Ford IV
> 800 Commerce Street
> Houston, TX 77002
> Tel: (713) 222-7211
> Fax: (713) 225-0827
>
> *Liaison Counsel for Plaintiff*
>
> **SAXENA WHITE P.A.**
> Maya Saxena
> Joseph E. White III
> Lester R. Hooker
> 2424 North Federal Highway
> Suite 257
> Boca Raton, FL 33431
> Tel:  (561) 394-3399
> Fax:  (561) 394-3382
>
> *Lead Counsel for Plaintiff*