UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| LOCAL 210 UNITY PENSION AND WELFARE FUNDS, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED, *et al*, <br><br> Plaintiffs, <br> VS. <br><br> MCDERMOTT INTERNATIONAL INC, *et al*, <br><br> Defendant. | CIVIL ACTION NO. 4:13-CV-2393 |

**MEMORANDUM OPINION AND ORDER**

**I.    INTRODUCTION**

In this consolidated securities fraud class action, PAMCAH–UA Local 675 Pension Fund (the "plaintiff") brings suit against McDermott International, Inc. ("McDermott" or the "Company"), Stephen M. Johnson ("Johnson"), former President and CEO of the Company, and Perry L. Elders ("Elders"), its Senior Vice President and CFO (collectively, the "defendants") for alleged violations of §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), as amended, 15 U.S.C. §§ 78j(b) and 78t(a), and Securities and Exchange Commission ("SEC") Rule 10b–5, 17 C.F.R. § 240.10b–5, promulgated thereunder.  Pursuant to FED. R. CIV. P. 12(b)(6), the defendants move to dismiss the Consolidated Class Action Complaint (the "Complaint," ECF No. 54) for failure to plead fraud with the heightened specificity required by Rule 9(b) of the federal procedure rules, and the Private Securities Litigation Reform Act

("PSLRA"), 15 U.S.C. § 78u–4 *et seq.* (ECF No. 55).[1]  The plaintiff filed an opposing response (ECF No. 57), in which it alternatively requests leave to amend the Complaint if dismissal is granted, and the defendants timely replied (ECF No. 58).  Having reviewed the pleadings, motion and responsive documents, the Court determines that the defendants' motion should be GRANTED and the plaintiff's request for leave to amend be DENIED.

## II.   FACTUAL AND PROCEDURAL BACKGROUND

### A.   McDermott's Business

The following facts are taken from the Complaint and public disclosure documents on file with the SEC.[2]  McDermott, headquartered in Houston, Texas, is a global engineering, procurement, construction and installation ("EPCI") company focused on designing and executing complex offshore oil and gas projects.  As an EPCI services provider, the Company delivers fixed and floating production facilities, pipeline installations and subsea systems from concept to commissioning.  McDermott conducts much of its business through fixed-price contracts—i.e., contracts executed for a pre-determined amount based on project cost and profit assessments—that are awarded through a competitive bid process.  All bids over $40 million are reviewed by executive management, including Johnson and Elders (the "individual defendants").  Executive officers additionally review developments on these projects on a monthly basis.

---

[1] The Court treats the plaintiff's Complaint as an amended one.  Original class action complaints were filed in this district by Jerad Flood, under Cause No. 4:13–CV–02442, on August 20, 2013, and by Local 210 Unity Pension and Welfare Funds, under the captioned case number, on August 15, 2013.  *See* Order Granting Stipulation on Amended Complaint and Motion to Dismiss Briefing Schedule, Dec. 17, 2013, ECF No. 44; Order Consolidating Action, Approving PAMCAH–UA Local 675 Pension Fund As Lead Plaintiff and Approving Selection of Counsel, Dec. 5, 2013, ECF No. 36.

[2] The Court takes judicial notice of the Company's 2012 annual report (Form 10–K) attached to the pending motion, cited in the Complaint, and on file with the SEC.  *See Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498–99 (5th Cir. 2000) ( "[D]ocuments that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to [its] claim." (citing cases) (internal quotation marks omitted)); *Lovelace v. Software Spectrum, Inc.*, 78 F.3d 1015, 1018 & n.1 (5th Cir. 1996) (adopting rule of *Kramer v. Time Warner, Inc.*, 937 F.2d 767, 774 (2d Cir. 1991), that in securities fraud action, judicial notice may be taken of contents of public disclosure documents required to be filed with SEC).

Because fixed-price contracts typically take years to complete, the Company often requires customers to make progress payments. McDermott employs a percentage-of-completion accounting method for determining contract revenue, which requires it to periodically review contract price and cost estimates and make profit adjustments to reflect work progress. Ultimately, successful and profitable completion of a project depends on several factors, including project bidding discipline, execution and oversight.

According to public disclosure documents, projects executed under McDermott's fixed-price contracts entail inherent risks that expose it to profitability losses. In fact, "[f]ixed-price contracts entail more risk to [the Company] because they require [it] to predetermine both the quantities of work to be performed and the costs associated with executing the work." Actual costs related to a project could exceed original projections notwithstanding measures taken in the first instance to account for "anticipated changes in labor, material and service costs." Specifically, "cost and gross profit . . . could vary materially from the estimated amounts because of supplier, contractor and subcontractor performance, [the Company's] own performance, changes in job conditions, unanticipated weather conditions, variations in labor and equipment productivity and increases in the cost of raw materials . . . over the term of the contract." Accordingly,

> current estimates of [McDermott's] contract costs and the profitability of [its] long-term projects, although reasonably reliable when made, could change as a result of the uncertainties associated with these types of contracts, and if adjustments to overall contract costs are significant, the reductions or reversals of previously recorded revenues and profits could be material in future periods.

Moreover, if developed into actual events, project risks could affect the business, financial condition, results of operations or cash flows of the Company in a manner that causes the trading price of company common stock to decline. These risks are matters of public record.

### B. Alleged Misrepresentations

The Complaint alleges that between November 6, 2012 and August 6, 2013, inclusive (the "Class Period"), the plaintiff purchased shares of McDermott common stock and that the stock value plummeted because the defendants concealed "pervasive" and "ongoing" failures related to the Company's project bidding, execution and oversight. These failures, the Complaint asserts, caused McDermott to experience significant losses. Stock prices dropped 13% in May of 2013 and another 21% in August of 2013 allegedly in response to the disclosure of these negative events.[3] It is claimed that investors suffered losses in the hundreds of millions of dollars as a result.

The Complaint blames the defendants for causing these losses by engaging in a course of fraudulent conduct that deceived the plaintiff and other class-member investors in the process. Allegedly, the defendants artificially inflated McDermott's stock price by making overly optimistic, false and/or misleading statements and concealing truths about McDermott's business, financial status and outlook. The information concerned material losses on several problematic projects and challenges related to project bidding and execution.

The individual defendants are quoted at length as proof that the two actively participated in the fraud. Their statements are contained in paragraphs 32–96 of the Complaint and summarized in the defendants' motion to dismiss. Representative statements are reprinted here for convenience and reference:

---

[3] In early November, 2012, McDermott's common stock was priced just below $10 per share. The price peaked at more than $13 per share on February 8, 2013. Between February 28, 2013, when the Company announced its 4Q2012 earnings, and March 1, 2013, the stock price dropped from $12.72 to $10.70 per share, an alleged 16% decline. Between May 8, 2013, when the Company released its 1Q2013 earnings, and May 9, 2013, the price dropped from $11.03 to $9.59, an alleged 13% decline. Finally, following the announcement of 2Q2013 results on August 5, 2013, the stock price dropped from $8.73 to $6.93 overnight, representing an alleged 21% decline.

- "*The positive results of our 2012 third quarter keep us on track for solid 2012 financial performance*" (quoting Johnson in Nov. 5, 2012 (3Q2012) Press Release (Form 8–K)).[4]

- The Company is on pace for "solid" performance (quoting Johnson in Nov. 5, 2012 (3Q2012) Press Release (Form 8–K), and Johnson and Elders on Nov. 6, 2012 conference call reporting 3Q2012 earnings).

- It is "my [Johnson's] belief that it is highly likely that we will return the Atlantic region to profitability into 2013" and that the region "*is likely to be one of the highest growth markets for the Company*" (quoting Johnson on Nov. 6, 2012 conference call reporting 3Q2012 earnings).

- The Atlantic Region's "*competitive situation remains stable in our view*" and "*nothing is changing in a material way up or down*" (quoting Johnson on Nov. 6, 2012 conference call reporting 3Q2012 earnings).

- "*We feel very good about our strength in the Middle East. We hold what we consider the strongest competitive position because of not only our Jebel Ali facility, but also because of the type of marine fleet we have*" (quoting Johnson on Nov. 6, 2012 conference call reporting 3Q2012 earnings).

- "*[W]e have done a number of other things in the Atlantic region to turn it around*" (quoting Johnson on Nov. 6, 2012 conference call reporting 3Q2012 earnings).

- "*I'm [Johnson] quite bullish on the Atlantic region these days.*" "*I'm sticking with my view about 2013 for the Atlantic region until I have a reason to adjust. And I don't have good reason to do that*" (quoting Johnson on Nov. 6, 2012 conference call reporting 3Q2012 earnings).

- There is "*no particular project or discrete item that needs to be highlighted*" and "*no major project issues to discuss*" (quoting Johnson and Elders on Nov. 6, 2012 conference call reporting 3Q2012 earnings).

- Johnson "remain[ed] positive" that the Atlantic segment would be profitable in 2013 (quoting Johnson on Mar. 1, 2013 conference call reporting 4Q2012 earnings) (brackets in Complaint).

- "*I [Elders] think we're going to have a good year in 2013 in the Middle East*" (quoting Elders on Mar. 1, 2013 conference call reporting 4Q2012 earnings).

---

[4] Unless otherwise noted, emphasized allegations were emphasized in the Complaint.

- "*We're feeling pretty good that we fully estimated the cost to complete*" the Malaysia project (quoting Johnson on Mar. 1, 2013 conference call reporting 4Q2012 earnings).

- "*McDermott is well positioned to meet the growing customer demand in each of our market segments*" (quoting Johnson and Elders on Mar. 1, 2013 conference call reporting 4Q2012 earnings).

- The problems faced in the Atlantic and Asia Pacific segments are "*isolated situations, and are not representative of our business as a whole*" (quoting Johnson and Elders on Mar. 1, 2013 conference call reporting 4Q2012 earnings).

- The 1Q2013 results reflect "*isolated challenges*"; "*we are absolutely focused on the resolution of those issues*" (quoting Johnson and Elders on May 9, 2013 conference call reporting 1Q2013 earnings).

- The loss in the Middle East is a "*one-time situation*," and "*there's nothing that we can see, or the project team can see, that would indicate any further problems with that program*" (quoting Johnson and Elders on May 9, 2013 conference call reporting 1Q2013 earnings).

- The Company is dedicated to "*implementing a comprehensive project execution operating model that emphasizes our key project management disciplines*." "Key elements of the model include project planning, including risk identification and mitigation planning, interface management, as well as the incorporation of clearly defined accountability across the organization." The model will enable the Company "to improve our execution on even the most challenging projects" (quoting Johnson and Elders on May 9, 2013 conference call reporting 1Q2013 earnings).

- Johnson is responsible for "bringing in project execution personnel from outside McDermott to assure best practices from industry are brought to bear on our projects" (quoting Johnson on May 9, 2013 conference call reporting 1Q2013 earnings).

- "*I [Johnson] would say we are equal to best in industry in terms of project planning, project analysis, execution, forecasting, and control. And that has been rolled out through the past 12 months throughout the entire organization*" (quoting Johnson on May 9, 2013 conference call reporting 1Q2013 earnings).[5]

---

[5] Without identifying specific speaker(s), paragraphs 65 and 88 of the Complaint quote the defendants as making a number of additional statements about general bidding discipline and revenue recognition.

The Complaint further alleges that the individual defendants are liable for suffered damages "[b]y virtue of their high level positions" and direct involvement in the day-to-day operations of the Company. These positions, the Complaint asserts, made Johnson and Elders "privy . . . to confidential propriety information concerning the Company and its business" and, therefore, responsible for the dissemination of any false and/or misleading statement or omission.

### C. Alleged "Partial Disclosures" by McDermott

The Complaint also alleges that the defendants made the following quarterly disclosures, characterized by the plaintiff as "partial disclosures," during the Class Period:

- "The fourth quarter 2012 results were negatively affected by an aggregate of approximately *$32 million of project losses and increased costs on certain projects, including approximately $23 million in the Asia Pacific segment* as a result of incremental costs associated with anticipated productivity and project delays on one subsea project, which is expected to complete in late 2013. *The Atlantic segment also was impacted by increased cost estimates relating to two fabrication projects totaling approximately $9 million*, due to lower than expected productivity, which are expected to complete in mid-2013" (quoting Feb. 28, 2013 (4Q2012) Press Release (Form 8–K)).

- "The Company's operating income in the first quarter 2013 was $53.0 million, a decrease of $27.2 million compared to $80.2 million in the first quarter 2012. The first quarter 2013 results were affected by operating losses in the Middle East and Atlantic segments, partially offset by stronger operating income in our Asia Pacific segment. In the first quarter 2013, operating losses in the Middle East segment totaled approximately $18.5 million compared to operating income of $34.7 million for the corresponding prior year period, a decline primarily attributable to execution plan changes on a project at an advanced stage of completion, which resulted in cost increases associated with hook-up activities and the use of third-party vessels. In addition, the decline in operating income was due to lower asset utilization and project activity compared to the prior year. The operating loss for the Atlantic segment changed by approximately $4.4 million to a loss of approximately $16.4 million due to increased support costs associated with lower marine asset utilization" (quoting May 8, 2013 (1Q2013) Press Release (Form 8–K)).

- On August 5, 2013, McDermott filed a Form 8–K with the SEC, in which McDermott announced its financial results for the second quarter ended

>June 30, 2013. McDermott announced a substantial decrease in the Company's year-over-year financial results driven primarily by $100 million in increased loss estimates on problematic projects. In its Asia Pacific segment, the Company incurred a $62 million charge "due to delays on a deepwater pipelay project in Malaysia" caused by late deliveries and McDermott's inability to timely reconfigure the vessel required to execute the project. This $62 million charge was in addition to the $23 million the Company previously recognized in 4Q2012-costs, which, on March 1, 2013, defendant Johnson assured investors the Company was confident had been "fully estimated." Defendant Johnson conceded on August 6, 2013 that the Malaysia failure was a "significant bid miss" (citing Aug. 6, 2013 (2Q2013) Press Release (Form 8–K)).

The defendants have not yet answered the Complaint. Instead, they move to dismiss it for failing to plead fraud with specificity.

## III. PARTIES' CONTENTIONS

According to the defendants, several reasons justify dismissal: the misrepresentations alleged in the Complaint are non-actionable expressions of corporate optimism about McDermott's financial performance, projects, bidding discipline and future prospects; the Complaint alleges "fraud by hindsight" and fails to explain how any of the challenged statements were false when made; the Complaint neither pleads scienter nor contains particularized allegations giving rise to a strong inference of scienter, as required by Rule 9(b) and the PSLRA; and the Complaint's derivative claims under § 20(a) of the Exchange Act fail because primary claims under § 10(b) do not meet the established pleading requirements for fraud.

Dismissal is improper, the plaintiff contends, because the Complaint pleads specific facts demonstrating that the defendants engaged in a pattern of fraud during the Class Period. In its view, the Complaint sufficiently alleges that the defendants' quarterly statements on November 5–6, 2012, February 28–March 1, 2013, and May 8–9, 2013 were false when made; the temporal proximity between the defendants' misleading statements and the disclosures of the truth demonstrate falsity; and the defendants made actionable misrepresentations related to the

Company's core EPCI projects. The plaintiff also contends that the Complaint alleges facts that command a strong inference that the defendants knew or were reckless in not knowing about the ongoing problems facing McDermott's operations. In support of this argument, the plaintiff cites to the defendants' quarterly disclosure statements and points to its assertion that the individual defendants took part in monthly review meetings where these problems were likely discussed.

## IV. STANDARD OF REVIEW

A motion to dismiss for failure to plead with the heightened specificity required by Rule 9(b), as "reinforce[d]" by the PSLRA, is properly raised in a Rule 12(b)(6) motion to dismiss for failure to state a claim. *United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 186 n.8 (5th Cir. 2009); *Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353, 362 (5th Cir. 2004); *Lovelace*, 78 F.3d at 1017. The Court accepts as true all well-pleaded facts and construes them in the light most favorable to the plaintiff. *Abrams v. Baker Hughs, Inc.*, 292 F.3d 424, 430 (5th Cir. 2002). The Court does not, however, "strain to find inferences favorable to the plaintiff," nor does it "accept conclusory allegations, unwarranted deductions, or legal conclusions." *See Southland*, 365 F.3d at 361 (internal quotation marks omitted); *Westfall v. Miller*, 77 F.3d 868, 870 (5th Cir. 1996). Dismissal is proper when it "appears beyond doubt that the plaintiff can prove no set of facts in support of [its] claim that would entitle [it] to relief." *Collins*, 224 F.3d at 498 (internal quotation marks omitted).

Rule 9(b) and the PSLRA require that the circumstances supporting a claim for securities fraud be pleaded "with particularity." FED. R. CIV. P. 9(b); 15 U.S.C. § 78u–4(b); *see Southland*, 365 F.3d at 361–62. Rule 9(b) states:

> In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally.

FED. R. CIV. P. 9(b). The PSLRA correspondingly provides, in relevant part, that a securities fraud complaint

> shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

15 U.S.C. § 78u–4(b)(1). In addition, the complaint "shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2)(A).

> Read together, Rule 9(b) and the PSLRA direct the pleader to:
>
> (1) specify . . . each statement alleged to have been misleading, *i.e.,* contended to be fraudulent;
>
> (2) identify the speaker;
>
> (3) state when and where the statement was made;
>
> (4) plead with particularity the contents of the false representations;
>
> (5) plead with particularity what the person making the misrepresentation obtained thereby; and
>
> (6) explain the reason or reasons why the statement is misleading, *i.e.,* why the statement is fraudulent.

*ABC Arbitrage Plaintiffs Grp. v. Tchuruk*, 291 F.3d 336, 350 (5th Cir. 2002). By Fifth Circuit nomenclature, these elements establish the "who, what, when, where, and how" required under Rule 9(b) and the PSLRA. *Id.* A district court must dismiss a § 10(b)/SEC Rule 10b–5 complaint that does not meet these requirements. 15 U.S.C. § 78u–4(b)(3)(A).

### IV. ANALYSIS AND DISCUSSION

"Private federal securities fraud actions are based on federal securities statutes and their implementing regulations." *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 238–39 (5th Cir. 2009)

(citing *Dura Pharmas., Inc. v. Broudo*, 544 U.S. 336, 341 (2005)). The Complaint purports to state a claim under § 10(b)/SEC Rule 10b–5 as to all defendants, and a derivative claim under § 20(a) as to the individual defendants. Under § 10(b), it is unlawful for any person to "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe." 15 U.S.C. § 78j(b). Correspondingly, SEC Rule 10b–5 prohibits any person from using any means or instrumentality of interstate commerce

> (a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,
>
> in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5. Based on these provisions, "[s]ection 20(a) . . . imposes joint and several liability upon persons who 'control' defendants that violate the Exchange Act. 15 U.S.C. § 78t(a)." *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 862 (5th Cir. 2003).

### A.  Section 10(b)/SEC Rule 10b–5 Claim

To state a claim under § 10(b)/SEC Rule 10b–5, a plaintiff must plead: a (1) misstatement or omission (2) of material fact (3) in connection with the purchase or sale of a security, which was made (4) with scienter, i.e. "a mental state embracing intent to deceive, manipulate, or defraud," and upon which (5) the plaintiff justifiably relied, (6) proximately

causing injury to it. *E.g.*, *id.* at 865–66 (internal quotation marks omitted). The pending motion argues that the Complaint fails to adequately plead materiality and scienter.[6] The Court agrees.

### 1. *Insufficient Allegations of Materiality*

The defendants argue that the statements attributed to them are immaterial because they constitute puffery. "[A] statement or omitted fact is material if there is a substantial likelihood that a reasonable investor would consider the information important in making a decision to invest." *E.g.*, *ABC Arbitrage*, 291 F.3d at 359 (internal quotation marks omitted); *accord Rosenzweig*, 332 F.3d at 865 (citing *Basic Inc. v. Levinson*, 485 U.S. 224, 231 (1988)). As the defendants point out, all of the statements casted as "misrepresentations" fall into one of four categories: (1) optimistic and vague statements regarding McDermott's future financial performance and profitability; (2) generalized statements about McDermott's positioning in various segments (regions) of operation; (3) indefinite descriptions of the challenges facing the Company and the Company's response to those challenges; and (4) generalized descriptions of McDermott's bidding discipline and project planning. None of these statements are "concrete factual or material misrepresentations" of the type that can be the basis for a § 10(b)/SEC Rule 10b–5 claim. *See Southland*, 365 F.3d at 372 (internal quotation marks omitted).

In this Circuit, expressions of corporate confidence, including "generalized, positive statements about [a] company's competitive strengths, experienced management, and future prospects," are immaterial and, thus, not actionable under the federal securities laws.

---

[6] The Court addresses the parties' dispute over falsity in its analysis of scienter.

*Rosenzweig*, 332 F.3d at 869.[7] The vast majority of alleged statements express nothing more than corporate optimism. These statements include announcements that the Company's positive 3Q2012 results would "keep [it] on track for solid 2012 financial performance" for the remainder of the year; the defendants "remain[ed] positive" and "belie[ved] that it [was] highly likely" that they could make profitable (in 2013) their operations in the Atlantic region, where they maintained a "stable," "competitive situation"; they "fe[lt] good about [their] strength in the Middle East"; Johnson remained "quite bullish" concerning McDermott's Atlantic presence; the Company was "well positioned to meet the growing customer demand in each of [its] market segments"; and the Company was "equal to best in industry in terms of project planning, project analysis, execution, forecasting, and control." The Complaint itself defeats its own pleading objective by characterizing the defendants' statements as statements of "positivity," albeit false from the plaintiff's perspective.

The Court is hard pressed to conclude that any of the above statements expresses or creates assurances about McDermott's future profitability that would lead a rational investor to rely on them. *See ABC Arbitrage*, 291 F.3d at 359 ("'[P]rojections of future performance not worded as guarantees are generally not actionable under the federal securities law' as a matter of law."). They constitute non-actionable puffery by all reasonable inferences. The defendants did not, as the plaintiff argues, "speak in concrete terms with respect to actions they were currently taking, and had already taken," nor did they "assure" investors that the Company had remedied challenges in each of its segments. If realized, any number of risks detailed in McDermott's

---

[7] The Court notes, without deciding, that under the PSLRA's "safe harbor" provision, a defendant is not liable for any "forward-looking" statement, as that term is defined by statute. 15 U.S.C. § 78u–5(c). Generally, a forward-looking statement is one that is "identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." *Id.* § 78u–5(c)(1)(A). It also includes a statement "made with actual knowledge . . . that the statement was false or misleading." *Id.* § 78u–5(c)(1)(B). The parties have neither raised nor briefed this issue, however.

2012 annual report could have compromised goals that appeared attainable when announced, or derailed Company plans altogether. The potential profitability losses associated with these risks are spelled out in this report. As extensively as the defendants are quoted in the Complaint, no allegation meaningfully reconciles the defendants' oral representations with these risk disclosures. To the extent that the plaintiff acknowledges the risks involved in McDermott's contracts, it glosses over their potential impact by clinging to the Company's touted "three-tiered approach to reviewing projects (local, global and executive level review) in order to mitigate risk."

Similarly, the allegations make no attempt to square the defendants' statements with the multi-million dollar losses acknowledged in the Complaint and announced on February 28, 2013 (4Q2012 results) and May 8–9, 2013 (1Q2013 results). Yet, this is precisely the kind of analysis a rational investor would likely have conducted before making projections about McDermott stock. Remarks made by analysts in August, 2013 make the point all too clearly. The Complaint states that at the same time analysts expressed surprise that McDermott was failing, they complained that the disappointing results from the previous quarter dealt "yet *another* blow to management credibility" and that McDermott had had issues in the past (emphasis added). They also inquired "why . . . the *rest* of the business" was falling apart at that particular juncture (emphasis added). These statements suggest that analysts had been alerted to and were in fact monitoring McDermott's progress *and* setbacks, and not simply relying on the Company's optimistic representations without considering known red flags. "It is difficult to form a 'strong inference' of scienter" from such telling factual concessions. *Rosenzweig*, 332 F.3d at 868.

In any event, to the extent that McDermott faced challenges, the defendants were "under no duty to cast [the Company's] business in a pejorative, rather than a positive, light." *Id.* at 869;

*Abrams*, 292 F.3d at 433 ("[A]s long as public statements are reasonably consistent with reasonably available data, corporate officials need not present an overly gloomy or cautious picture of the company's current performance.")). Accordingly, the defendants could have, for example, asserted that there were "no major project issues to discuss" and that problems faced in certain segments were "isolated situations" that were "not representative of our business as a whole," without running afoul of § 10(b)/SEC Rule 10b–5.

### 2. Insufficient Allegations to Raise Inference of Scienter

The parties dispute whether the Complaint pleads scienter, or an inference of scienter, with the requisite specificity. Scienter has been adequately pleaded if, taken together, the allegations directly or circumstantially show that a defendant has intentionally deceived, manipulated or defrauded the public, or acted with severe recklessness in doing so. *E.g.*, *Rosenzweig*, 332 F.3d at 866. In defining severe recklessness, the Fifth Circuit has stated:

> Severe recklessness is "limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standard of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it." Allegations of motive and opportunity, standing alone, are no longer sufficient to plead a strong inference of scienter, although appropriate allegations of motive and opportunity may enhance other allegations of scienter.

*Abrams*, 292 F.3d at 430 (citing *Nathenson v. Zonagen, Inc.*, 267 F.3d 400, 408, 410–12 (5th Cir. 2001)). Guided by Supreme Court and Fifth Circuit precedent, the Court takes the following three-step approach to determine whether a "'cogent and compelling,' [and] not merely 'reasonable' or 'permissible,'" inference of scienter exists: it assumes that the allegations to be true; to the extent applicable, it "consider[s] documents incorporated in the complaint by reference and matters subject to judicial notice"; and it "take[s] into account plausible inferences opposing as well as supporting a strong inference of scienter." *Ind. Elec. Workers' Pension*

*Trust Fund IBEW v. Shaw Grp., Inc.*, 537 F.3d 527, 533 (5th Cir. 2008) (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 321–24 (2007)).

The false and/or misleading statements alleged in the Complaint relate to the defendants' November, 2012, February/March, 2013, and May, 2013 statements. The plaintiff bears the burden of pleading the reason or reasons why these statements are false or misleading. FED. R. CIV. P. 9(b); *Southland*, 365 F.3d at 361–62. To meet this burden, the plaintiff essentially argues that the scienter pleaded in the Complaint is one of recklessness. It relies on a string of "plausabilities" and "implausabilities" about what the individual defendants knew or should have known based on their executive positions and day-to-day involvement in McDermott's business. These positions, it is alleged, afforded them at least monthly opportunities to participate in bid and project review meetings where problematic EPCI projects were likely discussed.

These contentions do not comport with the Fifth Circuit jurisprudence, however, and the plaintiff cites no binding case to support its faulty reasoning. The Fifth Circuit has held that "[a] pleading of scienter may not rest on the inference that [the] defendants must have been aware of the misstatement based on their positions with the company." *E.g.*, *Abrams*, 292 F.3d at 432. Moreover, falsity or scienter is not pleaded with particularity, as the plaintiff suggests, by simply alleging that a corporate officer attended a meeting. *See In re BP p.l.c. Sec. Ltg.*, 922 F. Supp. 2d 600, 632 & n.31 (S.D. Tex. 2013); *cf. Ind. Elec.*, 537 F.3d at 540 (reversing denial of motion to dismiss due to lack of scienter and rejecting allegation that defendants knew or should have known that their statements were false by virtue of monthly reports discussed at meetings). Here, the allegation has not been supported by particularized evidence that the individual defendants learned specific bad facts at specific meetings and later made a false statement with knowledge of the truth of those bad facts. A corporate officer's defendant's "hands-on"

management style or intimate involvement with a matter is likewise not sufficient to infer scienter. *See Ind. Elec.*, 537 F.3d at 535 ("Bernhard's [CEO] management style, coupled with his alleged boast that 'there is nothing in this company that I don't know,' are insufficient to support a strong inference of scienter."); *Goldstein v. MCI WorldCom*, 340 F.3d 238, 251 (5th Cir. 2003) ("[P]laintiffs' general allegation that Ebbers was a 'hands-on' CEO and therefore must have been aware of the accounts receivable situation simply lacks the requisite specificity."); *Abrams*, 292 F.3d at 431–32.

Equally unavailing is the attempt to manufacture falsity by linking generalized, optimistic statements with disappointing earnings results announced weeks or months later. Absent substantiation, these later results do not establish that the earlier statements were false when made. For example on August 6, 2013, when the defendants announced that the Company's Malaysia project was a "significant bid miss" requiring additional funding, this disclosure did not contradict their prior assertion on February 28/March 1, 2013 that they were "feeling pretty good that [they] fully estimated the cost to complete the project." On August 5, 2013, when the defendants made known that 2Q2013 losses in the Middle East segment were the result of "poor project management, especially around changed conditions," lack of oversight in project execution and "weaknesses" in operating performance, these so-called admissions did not convert into a falsity their previous belief that the Company was "going to have a good year in 2013 in the Middle East." Neither did the announcement discredit the earlier representation that there was nothing that would "indicate any further problems with that program." Similarly, Johnson's August, 2013 announcement regarding operating losses and the restructuring of the Atlantic segment on account of "increased support costs" and lower-than-expected utilization did not negate his November, 2012 statements regarding his "bullish" outlook on the Atlantic

17 / 20

segment and the Company's ability to maintain its position as a formidable bidding contender in the region.

Even when construed in the light most favorable to the plaintiff, the Complaint does nothing more than allege that in McDermott's quarterly earnings calls, the defendants should have accurately predicted what the results of the next quarter would be. "[C]ompany officials should not," however, "be held responsible for failure to foresee future events." *Abrams*, 292 F.3d at 433 (approving Second Circuit's observation in *Novak v. Kasaks*, 216 F.3d 300 (2d Cir. 2000)). No allegation supports an inference, much less a *strong inference*, that the defendants knew or should have known that there was no basis for concluding that project objectives were achievable. This is a classic case of pleading "fraud by hindsight," and the law makes no allowance for it. *See Rosenzweig*, 332 F.3d at 867–68 (affirming dismissal of securities fraud class action where certain factual underpinnings on which plaintiffs relied were hindsight assessments of defendants' performance); *Lormand*, 565 F.3d at 248–49 (defining "fraud by hindsight" as the case where "a plaintiff alleges that the fact that something turned out badly must mean defendant knew earlier that it would turn out badly" or where "there is no contemporaneous evidence at all that defendants knew earlier what they chose not to disclose until later"). Business misjudgments are simply not fraud. *Melder v. Morris*, 27 F.3d 1097, 1101 n.8 (5th Cir. 1994).

To the extent that any of the defendants' Class Period statements is an admission at all, it is at most an admission of mismanagement. "[N]egligence, oversight or simple mismanagement [do not] rise to the standard necessary to support a securities fraud action." *Abrams*, 292 F.3d at 433; *see Ind. Elec.*, 537 F.3d at 539 ("[T]he allegation of Shaw–Trac's problems may indicate corporate mismanagement, but the securities laws do not protect investors against negligence.");

*In re Anadarko Petrol. Corp. Class Action Litig.*, 957 F. Supp. 2d 806, 818 (S.D. Tex. 2013) ("Section 10(b) and [SEC] Rule 10b–5 do not protect investors against negligence or corporate mismanagement.").

Finally, virtually all of the challenged statements are cast in terms of personal opinions and beliefs about the future, rather than facts. A claim of securities fraud that rests on such opinion or belief is doomed to fail, however, unless the evidence shows that "the speaker did not in fact hold that belief and the statement made asserted something false or misleading about the subject matter." *Greenberg v. Crossroads Sys., Inc.*, 364 F.3d 657, 670 (5th Cir. 2004); *see Rosenzweig*, 332 F.3d at 869 (holding that statement by management that "[w]e anticipate funding capital expenditures . . . through operating cash flows and long-term debt" was immaterial because it was "qualified" as management's "anticipat[ion]," rather than fact); *see also Nolte v. Capital One Fin. Corp.*, 390 F.3d 311, 315 (4th Cir. 2004) ("[T]he Supreme Court held that in a securities fraud case, a statement of opinion may be a false factual statement if the statement is false, disbelieved by its maker, and related to matters of fact which can be verified by objective evidence." (citing *Va. Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1093 (1991)). The Complaint makes no particularized showing that the defendants did not believe what they were saying when they said it.

Because the plaintiff fails to sufficiently plead materiality and scienter, its § 10(b)/SEC Rule 10b–5 claim must be dismissed.

B.  **Section 20(a) Claim**

The plaintiff's § 20(a) claim is a derivative claim of § 10(b). Based on the failure of the primary claim, it too must be dismissed.

### C. Leave to Amend

The plaintiff makes a one-sentence request seeking leave to amend the Complaint for the second time. A district court has discretion to grant or deny motions to amend pleadings. FED. R. CIV. P. 15(a) (leave to amend "shall be freely given when justice so requires"). Although Rule 15(a) "evinces a bias in favor of granting" such a motion, *Rosenzweig*, 332 F.3d at 863 (internal quotation marks omitted), deference towards this bias is not warranted here since the Court afforded the plaintiff an opportunity once already to cure pleading deficiencies in the original complaints. *See supra* note 1. The plaintiff has not presented any new information to cure the existing deficiencies. Accordingly, the request for leave to amend is denied and the Complaint is dismissed with prejudice. *See id.* at 864–65 ("The Supreme Court lists five considerations in determining whether to deny leave to amend a complaint: 'undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of the allowance of the amendment, [and] futility of the amendment . . ..' *Foman v. Davis*, 371 U.S. 178, 182 (1962).").

## VI. CONCLUSION

Based on the foregoing analysis and discussion, the defendant's motion to dismiss is GRANTED and the Complaint dismissed with prejudice.

It is so **ORDERED**.

SIGNED on this 13th day of March, 2015.

_____
Kenneth M. Hoyt
United States District Judge